# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JERRY L. COHEN, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:21-cv-01361-AKK** |
| | ) | |
| **WILLIE HILL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Nelson Mandela famously wrote, "No one truly knows a nation until one has been inside its jails."[1] If the allegations in this lawsuit prove true, then this case highlights our significant flaws. Time after time, individuals incarcerated at the Jefferson County Jails in Birmingham and Bessemer, Alabama, have urged officials to address a panoply of horrendous conditions within the Jails' walls. At the same time, the incarcerated population continues to rise, as many, like the plaintiff in this case, await trial on charges for which they are not yet convicted, if at all.[2] The

---

[1] NELSON MANDELA, LONG WALK TO FREEDOM (1994).

[2] *See Incarceration Trends in Alabama*, VERA INST. OF JUSTICE (Dec. 2, 2019), https://www.vera.org/publications/state-incarceration-trends/alabama-1 (last visited Feb. 2, 2022) ("Since 1970, the total jail population has increased 307%. In 2015, pretrial detainees constituted 70% of the total jail population in Alabama."); Ramsey Archibald, *Alabama incarcerated: How do state prisons and jails compare to the rest of the nation?*, AL.COM (Sept. 23, 2019) ("[W]hile working to relieve its overcrowded prisons, Alabama is also locking up thousands of residents in local jails . . . .").

increasing detainee population has put pressure on a system already lacking the resources to adequately house them, much less rehabilitate and release them.

In this case, Jerry L. Cohen, Jr., brings claims under 42 U.S.C. § 1983 and Alabama law against supervisors, deputies, and control room operators[3] at the Jefferson County Jail in Birmingham ("Birmingham Jail") for alleged violations of his constitutional rights while he was detained there. *See* doc. 15. He alleges that severe, historically documented overcrowding and understaffing issues at Birmingham Jail have continuously prevented officers from adequately screening, supervising, and providing resources to detainees, leading to widespread and unchecked violence among inmates. These conditions allegedly enabled a group of inmates to brutally attack Cohen without intervention by officers or adequate staffing and management by their supervisors, who knew of the Jail's problems.[4]

---

[3] Specifically, Cohen sues Chief Deputy Willie Hill, Major Cleveland Moore, Deputy Chief David Agee, Deputy Chief David Thompson, Deputy Chief Felicia Rucker-Sumerlin, Captain Wendell Major, Sergeant James Posey, Deputy Alex Moore, Deputy Butler, Deputy Anthony Marks, Deputy Anthony Bellipanni, Jennifer Hays, Janet Kendricks, Captain James Guntharp, Sergeant Terry Scott, and Sergeant Heath Boackle. *See* doc. 15.

[4] Cohen refers to Chief Deputy Hill, Major Moore, Deputy Chief Agee, Deputy Chief Thompson, Deputy Chief Rucker-Sumerlin, Captain Major, Captain Guntharp, Sergeant Boackle, Sergeant Scott, and Sergeant Posey as the "Supervisor Defendants," doc. 15 at 34, and Sergeant Scott, Sergeant Posey, Deputy Moore, Deputy Butler, Deputy Marks, Deputy Bellipanni, Kendricks, and Hays as the "Defendant Deputies and CROs," *id.* at 36. Sergeants Scott and Posey apparently belong to both groups of defendants because they allegedly supervised the deputies and CROs and had independent authority to control and supervise the detainees on Cohen's block during their respective shifts. *See id.* at 20, 26. Allegedly, Sergeant Scott served as the "day shift supervisor" and "booking sergeant," *id.* at 20, and Sergeant Posey ran the evening shift, *id.* at 26. Kendricks and Hays purportedly served as the relevant control room operators ("CROs"). *Id.* at 8–9.

*See id.* For their part, the defendants, minus Captain Major and Deputy Moore whom Cohen has yet to serve, deny these allegations and move to dismiss Cohen's claims. *See* doc. 18; *id.* at 1 n.1. After reviewing the briefing, docs. 18; 19; 24; 25, and the law, the court concludes that the motion, doc. 18, is due to be denied except for the claims against the fictitious defendants and any § 1983 claims for direct, individual liability against the Supervisor Defendants, setting aside Sergeants Scott and Posey.

## I.

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This does not require "detailed factual allegations," but it does demand more than "unadorned" accusations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" will not suffice. *Id.*; *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012).

If a complaint fails to state a claim upon which relief can be granted, the court must dismiss it. FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts, taken as true, to state a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Resnick*, 693 F.3d at 1325. "Plausibility is the key, as the well-pled allegations must nudge the claim across the line from conceivable to plausible." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d

1327, 1333 (11th Cir. 2010) (internal quotation marks omitted).  A facially plausible claim "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 555 U.S. at 678.  The court draws from its "judicial experience and common sense" to resolve this context-specific inquiry.  *Id.* at 679; *Resnick*, 693 F.3d at 1324.

## II.[5]

This case arises from a brutally violent incident between Cohen and other detainees in September 2019.  Before describing the horrific facts, to contextualize Cohen's claims, the court begins by summarizing the allegations and the materials Cohen attaches to his complaint that chronicle overcrowding and understaffing issues at Birmingham Jail.  *See* doc. 15 at 42–104.

### A.

In 1998, the Civil Rights Division of the U.S. Department of Justice retained a consultant to examine Birmingham Jail and the Jefferson County Jail in Bessemer ("Bessemer Jail") with a focus on "inmate safety and security."  *Id.* at 58–59. Following site inspections of the Jails, staff interviews, and secondary research, the consultant concluded that the Jails "[were] dangerously overcrowded," with

---

[5] The court accepts Cohen's allegations as true for purposes of the Rule 12(b)(6) motion.  *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (citing *GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)).  Labels and conclusions unsupported by factual allegations, however, do not receive the benefit of this presumption.  *Iqbal*, 556 U.S. at 662.

detainees double-, triple-, and quadruple-celled.  *See id.* at 60, 62.  *See also id.* at 85. The consultant also determined that "Birmingham Jail [was] dangerously understaffed," which led to detainee suicide attempts and assaults without interventions from staff or officers.  *Id.* at 63–64.  The consultant found that these events "[were] clearly not isolated incidents" and that they required "adequate officer presence" to "prevent the altercations in the first instance rather than just observe and intervene after they occur."  *Id.* at 65.

The report detailed inmates' insufficient access to medical services, delayed distribution of mail, and abbreviated visitation.  *Id.*  The consultant found that it was "not unusual, especially during peak activity, for inmates to be placed in holding cells for extended periods without any pre-classification screening"—a "dangerous practice" that ignored "mental health commitment history, history of mental health problems, current family problems, job loss, death of loved ones, etc."  *Id.* at 66–67. The consultant concluded that "[a]n inmate classification system [was] necessary for the safe operation of [the Jails] . . . to identify those inmates who present a serious threat to themselves, staff, other inmates or to the community."  *Id.* at 67.

## B.

In 2014, the Jails became subject to a settlement agreement following the resolution of *Mason v. Hale*, No. 2:11-cv-03155-TMP (N.D. Ala. 2011), a class action filed to address the Jails' overcrowding problems.  *See id.* at 43–44, 56.  The

parties agreed that Birmingham Jail would transfer at least 100 detainees to
Bessemer Jail by February 2014 and at least another 100 detainees by June 2014,
that the Jails could not house more than two detainees per cell unless otherwise
certified, and that counsel would receive procedures for separating "high-risk"
detainees or those with physical and mental disabilities. *Id.* at 44–45. The agreement
also stipulated that the Jails would hire more officers and provide recreational
activities, functioning services, and clean toiletries and linens to inmates. *Id.* at 45.

### C.

In February 2019, Jefferson County allegedly closed Bessemer Jail for seven
months to make repairs. *Id.* at 17. The County consequently moved inmates from
Bessemer Jail to Birmingham Jail, which had a "history" of inmate-on-inmate abuse.
*Id.* Cells designed to house one or two people began to house three or four, and
"[v]iolent Bessemer Jail inmates that had previously formed a gang or 'kludge'
group to intimidate, beat, and rob other inmates . . . were housed with non-violent
Birmingham Jail inmates." *Id.* at 17–18. The Jail required inmates to sleep on the
floor and congregate in a "crowded and tense" dayspace. *Id.* at 18. These conditions
purportedly allowed inmates to "access, create, and conceal weapons and
contraband," and "defective or altered cell door locks" and "outdated and
insufficient video surveillance equipment" hindered supervision by staff. *See id.*

6

D.

In several articles updated in 2019, AL.com reported that detainees "sle[pt] three or four to a cell" and that "[o]vercrowding, underfunding and understaffing" problems persisted. *Id.* at 90, 101. In one article,[6] officials and detainees discussed the severity of the conditions in the Jails,[7] *see id.* at 90, and another article reported on a federal lawsuit against Birmingham Jail officials for the same conditions,[8] *id.* at 101–02. A third article reported the killing of a detainee by a fellow inmate in Birmingham Jail after they were moved from the closed Bessemer Jail.[9] *See id.* at 97. In this article, Agee, identified as a captain, noted that "fights happen[ed] every day" and that officers sought to "break[] up fights" and "keep the peace" daily. *Id.*

E.

Against this backdrop, Cohen pleads the following facts. In early June 2019, Cohen was taken into custody at Birmingham Jail for allegedly violating the

---

[6] Carol Robinson, *Jefferson County jail faces staff cuts amid overcrowding (slideshow)*, AL.COM (Jan. 14, 2019).

[7] One lieutenant with the County Sheriff's Office commented, "The conditions right now I thought I'd never see," and a chief deputy remarked, "It is dangerous for our deputies, dangerous for the inmates and the liability for the county is extremely high." *See* doc. 15 at 90–91. The captain who oversaw Birmingham Jail outlined "major problems" in the Jail, and "[a]t the top of the list . . . [was] the overcrowding." *Id.* at 92.

[8] Kent Faulk, *Federal lawsuit filed against Jefferson County, claiming crowded and poor jail conditions*, AL.COM (Jan. 14, 2019).

[9] Carol Robinson, *Hoover murder suspect killed by another inmate in Jefferson County Jail cell, authorities say*, AL.COM (Feb. 21, 2019).

quarterly verification provisions of the Sex Offender Registration and Notification Act.  *Id.* at 18.  "Because of a lack of proper screening during the intake process, lack of meaningful inmate classification, and lack of bedspace," Cohen, who describes himself as a nonviolent offender, was housed with some of the Jail's "most violent offenders."  *Id.* at 19.

In mid-August 2019, an inmate attacked Cohen in the dayroom area of Cohen's cell block, and Cohen sustained injuries to his lips and nose.  *Id.* Approximately one week later, the same inmate attacked Cohen in the dayroom area again.  *Id.*  Cohen sustained "serious physical injuries" and was transported to the emergency room for sutures.  *Id.*

The attacks did not stop.  On September 11, 2019, a group of inmates, including several charged with violent offenses, attacked and sexually assaulted Cohen in his cell on Level 7 for more than two hours.  *Id.* at 19–20.  First, just before 12:40 p.m., one inmate "hung a blanket or another similar object on the second-tier railing in close proximity to Cohen's cell, in violation of Jail Rules."  *Id.* at 23. Another inmate soon moved this object so that it hung in front of Cohen's cell, also in violation of Jail rules.  *Id.*  One minute later, seven inmates "emerged from the neighboring cell" and entered Cohen's, ambushing him and his cellmate.  *Id.* Cohen's cellmate exited the cell, which was left unlocked in contravention of Jail policy.  *See id.*  Over the next two hours, different inmates entered Cohen's cell,

where they beat him unconscious, poked his forehead with a "makeshift tattoo needle," cut his hair with a razor, pulled off his pants, exposed themselves in his face, and urinated or placed urine in his mouth. *Id.* at 24.

Just after 3:00 p.m., several inmates carried Cohen, still unconscious, out of his cell, propped him against the wall, and covered him with a blanket. *Id.* at 25. The assaults and injuries "were so extreme" that other inmates purportedly used the Jail's telephones and text- and video-messaging systems to ask individuals outside the Jail to contact Jail staff and to send help. *Id.* Their messages described that Cohen "was unconscious for an extended time, that he was bleeding, that he was having seizures, and that other inmates believed [he was] dying." *Id.*

Allegedly, Deputies Moore and Butler "were the assigned [d]eputies to . . . Level 7 on dayshift from approximately 6:00 a.m. to 2:00 p.m.," Hays "was assigned as the control room operator for Level 7 on dayshift," and "[Sergeant] Scott was the assigned supervisor of deputies on the day shift." *Id.* at 20.  Sergeant Posey, Deputies Marks and Bellipanni, and CRO Kendricks apparently took over during the evening shift from 2:00 p.m. to 10:00 p.m.  *Id.* at 21, 26.  In addition, during this time, Sergeants Scott and Posey, with their deputies, purportedly "knowingly permitted inmates to have ingress and egress to their own cells and the cells of others . . . while in the dayspace." *Id.* at 26.  Although these officers were therefore

present and on shift in this area of the Jail in the leadup to and during the lengthy attack, none intervened. *Id.* at 20–21.

Finally, at approximately 3:13 p.m., Deputy Marks conducted "cell checks and inmate counts" while Deputy Bellipanni "remained at the block slider." *Id.* at 26. Deputy Marks, upon discovering Cohen propped against the wall, asked Cohen what was wrong. *Id.* When Cohen did not respond, Deputy Marks continued to check the rest of the cell doors before he and Deputy Bellipanni left the block. *See id.* About 10 minutes later, Deputies Marks and Bellipanni returned to the block and used the blanket covering Cohen's body to carry him to the Jail's visitation room. *Id.* at 27. Cohen was subsequently taken to the Jail's medical station and transported to the emergency room. *Id.* He was then admitted to a hospital and, later, a rehabilitation center. *Id.*

Cohen asserts that he received several months of in-patient treatment, continues to receive outpatient treatment, and is now physically and cognitively disabled following "a traumatic brain injury, neurological injury, fractured ribs, a fractured sternum, emotional distress, mental anguish, loss of earning capacity, and substantial medical bills and permanent injury." *Id.* at 27, 32, 35. Cohen filed this lawsuit in state court against the deputies, sergeants, CROs, their supervisors, and fictitious parties, and the defendants removed it to this court shortly thereafter. *See*

doc. 1.  Cohen amended his complaint to identify several fictitious parties, doc. 15,

and the defendants now move to dismiss, doc. 18.

## III.

Under 42 U.S.C. § 1983,[10] Cohen pleads that all of the defendants violated the

Fourteenth Amendment: that each defendant was deliberately indifferent to the

substantial risk of serious harm against him, doc. 19 at 32; that the Supervisor

Defendants failed to staff, assign, and supervise the Defendant Deputies and CROs,

*id.* at 33; and that the Defendant Deputies and CROs failed to intervene to protect

him from harm during the attack, *id.* at 36.  Cohen also pleads that the Defendant

Deputies and CROs behaved negligently and/or wantonly by failing to provide for

detainees' safety, *id.* at 37, and that the Supervisor Defendants negligently and/or

wantonly trained, assigned, and supervised the Defendant Deputies and CROs, *id.* at

38.  The defendants move to dismiss these claims, asserting federal and state-law

immunities.  *See* docs. 18 at 2; 19 at 2.  The defendants also argue that the complaint

constitutes an impermissible "shotgun pleading" because it stacks the same

allegations in each count, fails to state claims with sufficient particularity, and pleads

---

[10] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.

allegations against fictitious defendants. *See* doc. 19 at 5, 8. Because the latter contentions go to the entirety of the complaint, the court turns to them first.

## A.

The defendants argue that Cohen's claims "incorporate by reference the allegations of all preceding paragraphs" and "fail[] to specify which [d]efendants committed specific acts as alleged." Doc. 19 at 6–7. They also assert that the court must dismiss the claims against the fictitious defendants. *Id.* at 8; doc. 25 at 4–5.

## 1.

Under Federal Rules of Civil Procedure 8(a) and 10(b), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief" and "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." FED. R. CIV. P. 8(a), 10(b). The purpose of these rules

> is to require the pleader to present his claims discretely and succinctly, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

*T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1543 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting). "Complaints that violate either Rule 8(a)(2), or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015).

The Circuit has identified "four rough types or categories of shotgun pleadings," *id.* at 1321, and the defendants in this case contend that Cohen's complaint falls under the first and fourth. According to the defendants, the complaint "contain[s] multiple counts where each count adopts the allegations of all preceding counts" and "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *See id.* at 1321–23; doc. 19 at 6–7.

However, the amended complaint itself contradicts these contentions. Cohen's claims do not incorporate the allegations of each preceding *count* but instead reallege paragraphs 25–96 at the outset of each count. *See* doc. 15 at 32, 34, 36–38. These paragraphs, with two limited exceptions,[11] are background allegations contained in the complaint's "Statement of Facts," not allegations in previous claims. *See id.* "The allegations of each count are not rolled into every successive count on down the line," and "[m]ore importantly, this is not a situation where a

---

[11] Paragraphs 95 and 96 are the first two paragraphs of Count I. *See* doc. 15 at 32. Presumably, the inclusion of paragraphs 95 and 96 at the outset of each count is a mistake, because there is no need for Count I to "incorporate[]" two of its own paragraphs. In any event, because the court can discern that Cohen incorporates background facts which tend to support his legal claims, not factual allegations of the preceding counts, his complaint does not violate Rules 8(a) and 10(b) on this ground. Nor does Cohen's inadvertent inclusion of two paragraphs labeled No. 31 render his complaint a shotgun pleading. *See* doc. 25 at 5. Both paragraphs contain background factual allegations chronicling overcrowding and understaffing conditions at Birmingham Jail, which are relevant to the Supervisor Defendants' alleged knowledge of the purportedly unconstitutional practices at the Jail. *See* doc. 24 at 15.

failure to more precisely parcel out and identify the facts relevant to each claim materially increase[s] the burden of understanding the factual allegations underlying each count." *Weiland*, 792 F.3d at 1324.

In addition, although Cohen pleads claims against a sizable group of defendants, Cohen makes clear against whom each claim is alleged. He alleges the first § 1983 claim against all of the defendants, the second against the Supervisor Defendants, and the third against the Defendant Deputies and CROs, and his complaint defines these groups. *See* doc. 15 at 32–33, 36. He also alleges a state-law claim against the Defendant Deputies and CROs and a state-law claim against the Supervisor Defendants. *See id.* at 37–38. His factual allegations make clear the identity of each named defendant and the role each allegedly played in Cohen's injuries. Because the court can readily ascertain against whom and for what conduct Cohen alleges his claims, the court will not dismiss his complaint at the threshold.

### 2.

The defendants also challenge the amended complaint because it names fictitious parties. *See* docs. 19 at 8; 25 at 4–5. "As a general matter, fictitious-party pleading is not permitted in federal court" unless "the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). Under this rule, for example, the Circuit permitted a *pro se* litigant to add "Chief Deputy of the Jefferson County Jail

14

John Doe" as a defendant because his description was "sufficiently clear," and he would have soon received information from the jail allowing him to identify the chief deputy by name. *See Dean v. Barber*, 951 F.2d 1210, 1216 (11th Cir. 1992). Here, Cohen does not specifically identify the unnamed defendants, "Nos. 1–8," but instead describes them as additional supervisors or deputies and CROs who allegedly participated in the underlying misconduct. *See generally* doc. 15. The claims against Nos. 1–8 are due to be dismissed because the fictitious parties' identities are not described with sufficient particularity, *see Richardson*, 598 F.3d at 738, even after the court allowed Cohen to amend his complaint to identify some of the fictitious defendants, *see* docs. 14; 15.

Because the rest of the complaint passes Rule 8(a) and Rule 10(b) muster, the court proceeds to Cohen's § 1983 claims and the defendants' assertion of qualified immunity.

## B.

Cohen pleads three categories of § 1983 claims predicated on the Fourteenth Amendment: (1) against all of the defendants for their deliberate indifference to the "known and substantial risk of serious harm" against him, (2) against the Supervisor Defendants for failing to sufficiently staff and supervise the deputies and CROs, and (3) against the Defendant Deputies and CROs for failing to intervene to protect

Cohen from the assault.  *See* doc. 15 at 32–37.  *See also* doc. 24 at 9.  The defendants

assert their entitlement to qualified immunity.

In short, qualified immunity shields officers from individual liability for torts

they commit while performing "discretionary duties," unless their acts violate "a

clearly established statutory or constitutional right."  *Zivojinovich v. Barner*, 525

F.3d 1059, 1071 (11th Cir. 2008).  To invoke the doctrine's sweeping protection, an

officer must first establish that he or she "act[ed] within the scope of his or her

discretionary authority when the challenged action occurred," where "'discretionary

authority' 'include[s] all actions . . . that (1) were undertaken pursuant to the

performance of his [or her] duties, and (2) were within the scope of his [or her]

authority.'"  *Patel v. City of Madison*, 959 F.3d 1330, 1337 (11th Cir. 2020).  To

defeat immunity, the plaintiff must then allege (1) a violation of his or her

constitutional rights and (2) that these rights were "clearly established" at the time

of the misconduct.  *See Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016)

(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine, subject to

increasing and justified criticism,[12] was developed by federal courts to render

---

[12] As Judge Carlton Reeves aptly observed:

If Section 1983 was created to make the courts 'guardians of the people's federal rights,' what kind of guardians have the courts become? One only has to look at the evolution of the doctrine to answer that question. Once, qualified immunity protected officers who acted in good faith. The doctrine now protects all officers, no matter how egregious their conduct, if the law they broke was not 'clearly established.' This 'clearly established' requirement is not in the Constitution or a

immune all officers but the "plainly incompetent" or those who "knowingly" violate federal law.  *See Patel*, 959 F.3d at 1337.

1.

As the defendants acknowledge, "[t]o establish the defense of qualified immunity, the burden is first on [them] to establish that the allegedly unconstitutional conduct occurred while [they were] acting within the scope of [their] discretionary authority."  *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998); doc. 19 at 13–14.  "If, and only if, the defendant[s] do[] that will the burden shift to [Cohen] to establish that the defendant[s] violated clearly established law."  *See Harbert Int'l*, 157 F.3d at 1281.  But the defendants simply assert that "[they] can satisfy their initial burden" and provide no further support for this contention.  *See* doc. 19 at 13–14.  Though they may be right that they can show "whether their jobs involved engaging in the [allegedly tortious] act in general" to meet their burden, *id.* at 14, such a "bald assertion" does not suffice, *see Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (citing *Barker v.*

---

federal statute. The Supreme Court came up with it in 1982. In 1986, the Court then 'evolved' the qualified immunity defense to spread its blessings 'to all but the plainly incompetent or those who knowingly violate the law.' It further ratcheted up the standard in 2011, when it added the words '*beyond debate.*' In other words, 'for the law to be clearly established, it must have been beyond debate that [the officer] broke the law.'

*Jamison v. McClendon*, 476 F. Supp. 3d 386, 404 (S.D. Miss. 2020) (some internal punctuation omitted).

17

*Norman*, 651 F.2d 1107, 1124–25 (5th Cir. Unit A July 1981)).  As one court put it, "[i]t may be that [the] defendants can prove that their actions were within the scope of their discretionary authority. However, it is not incumbent upon the [c]ourt to create from a devoid record proof of [their] affirmative defense."  *Beech v. City of Mobile*, 874 F. Supp. 1305, 1310 n.4 (S.D. Ala. 1994).  Here, the defendants fail to sufficiently invoke the doctrine in the first place.

2.

Alternatively, even if the defendants can establish that they acted within their discretionary authority, Cohen adequately pleads clearly established Fourteenth Amendment violations.  *See Perez*, 809 F.3d at 1218.

The constitutional rights of pretrial detainees like Cohen arise from the Due Process Clause of the Fourteenth Amendment rather than from the Eighth Amendment.  *See Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995); *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572 (11th Cir. 1985).  Under these amendments, jail and prison officials have an obligation to protect detainees and prisoners from violence by fellow detainees and prisoners.  *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013); *Dickinson v. Cochran*, 833 F. App'x 268, 271 (11th Cir. 2020) (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014)).  *See also Farmer v. Brennan*, 511 U.S. 825, 828, 833 (1994).  A jail official violates the Fourteenth Amendment if the official "is deliberately indifferent to a

18

substantial risk of serious harm to an inmate who suffers injury." *Dickinson*, 833 F. App'x at 271 (quoting *Marbury v. Warden*, 936 F.3d 1277, 1233 (11th Cir. 2019)).

At the motion-to-dismiss stage, the plaintiff must allege "an objectively substantial risk of serious harm to prisoners" and "that the jail official was deliberately indifferent, which requires the following: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" *Id.* at 271–72 (quoting *Goodman*, 718 F.3d at 1331–32). Put another way, the plaintiff must plead that the jail official knew of a substantial risk of serious harm and did not reasonably respond to the risk, causing injuries to the plaintiff. *See Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). In addition, for claims against supervisors, "a plaintiff . . . must show that the supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Dickinson*, 833 F. App'x at 272 (quoting *Harrison*, 746 F.3d at 1298).

In this case, Cohen pleads that all of the defendants were deliberately indifferent to the serious risk of harm posed to him by other inmates, leading to his brutal assault. *See* doc. 15 at 32–33. Cohen also pleads that the Supervisor Defendants failed to properly supervise and staff the deputies and CROs at the Jail. *Id.* at 33–34. Last, Cohen pleads that the Defendant Deputies and CROs failed to intervene during the violence against him. *Id.* at 36. The court begins with the

claims against the Defendant Deputies and CROs before addressing the claims against the Supervisor Defendants.

a.

Cohen's Fourteenth Amendment § 1983 claims against the Defendant Deputies and CROs hinge on their alleged failures to prevent and stop the attack against him, even though each deputy and CRO was allegedly on duty for at least one hour during the attack, and despite their knowledge of previous violence against Cohen and the purported "well-known culture of violence at the Jefferson County Jails." *See* doc. 15 at 32, 36. In their motion, the Defendant Deputies and CROs claim that Cohen's apparent failure to adhere to Federal Rules of Civil Procedure 8(a) and 10(b) warrants dismissal of his claims because they cannot determine which individual deputy or CRO "[is] being alleged to have violated [Cohen's] constitutional rights." Doc. 19 at 16. *See also id.* at 24–25. This contention lacks merit.

First, the court disagrees that Cohen's complaint violates Rules 8(a) and 10(b). *See supra* § III.A. Further, Cohen clearly alleges that Deputies Moore, Butler, Marks, and Bellipanni and CROs Hays and Kendricks were assigned to Level 7 during the attack against him, with Deputies Moore and Butler and CRO Hays on duty until 2:00 p.m. and Deputies Marks and Bellipani and CRO Kendricks taking over thereafter. *See* docs. 15 at 20–21; 25 at 6. Cohen also alleges that Sergeant

20

Scott worked as the "day shift supervisor" over Deputies Moore and Butler and CRO Hays, that Sergeant Posey managed the evening shift, and that Sergeants Scott and Posey "knowingly permitted inmates to have ingress and egress to their own cells and the cells of others . . . while in the dayspace" during their shifts.  *See* doc. 15 at 20, 26.  To be sure, Cohen's lengthy complaint pleads claims against a variety of individuals at the Jail.  But the court can discern that each of these defendants was allegedly assigned to monitor and protect the inmates on Level 7 of the Jail during the attack and that each of the Defendant Deputies and CROs allegedly played a direct role in disregarding the substantial risk of violence against Cohen.  Thus, the court rejects the Defendant Deputies and CROs' contention that they cannot adequately defend against Cohen's § 1983 claims.

This argument aside, nearly all of the portions of the defendants' motion and reply that address the § 1983 claims on their merits do so on behalf of the Supervisor Defendants.  *See id.* at 15–24 (discussing supervisory liability); doc. 25 at 5–7 (same).  As to the Defendant Deputies and CROs, the court is essentially left with Cohen's contentions, which amount to the following.  First, Cohen asserts that these defendants each knew of a risk of "serious harm" to him given the long and well-documented history of overcrowding and violent conditions at the Jail, *see* doc. 15 at 12–18, the two prior attacks against Cohen in the day-room area of his block, *see id.* at 19, and the observable violations of Jail rules (*e.g.*, hanging up a blanket in

front of Cohen's cell) in the immediate lead-up to the attack, *id.* at 22–23.  *Cf.*
*Dickinson*, 833 F. App'x at 272 (concluding that the plaintiff sufficiently pleaded
that a sheriff and a warden "knew about the history of widespread inmate-on-inmate
abuse at the jail" given his allegations that the jail "routinely housed dangerous
inmates in crowded conditions with non-violent inmates" and "inadequately
supervised inmates").

Cohen next contends that Sergeants Scott and Posey and the deputies
"permitted inmates to have ingress and egress to their own cells and the cells of
others while in the dayspace" and took no actions during their shifts to investigate
the blanket hung in front of Cohen's cell or to ensure the cells were locked, in
contravention of Jail rules.  Doc. 15 at 26.  In addition, Deputies Butler and Moore
and CRO Hays, who were on duty in the morning and early afternoon, allegedly
failed to check the hanging blanket or investigate when seven inmates collectively
entered Cohen's cell, even though these events "[were] done in plain view of the
surveillance cameras and the observation windows of the Control Room where
[they] were stationed and could observe."  *See id.* at 23–24.  Allegedly, when
Deputies Marks and Bellipanni and CRO Kendricks took over at 2:00 p.m., these
defendants likewise did not investigate or intervene although the blanket continued
to obscure Cohen's cell as other inmates entered, exited, and peered inside "in full
view of surveillance cameras."  *See id.* at 25–26.  It was not until after 3:00 p.m.,

22

after the blanket hung in front of Cohen's cell for the first hour of their shifts and other inmates placed Cohen's unconscious body outside his cell, that Deputies Marks and Bellipanni conducted cell checks and subsequently took Cohen to receive medical care. *Id.*

Considering these allegations, Cohen adequately pleads that the Defendant Deputies and CROs, including Sergeants Scott and Posey, disregarded the substantial risk of serious harm against him and that their actions went beyond mere negligence. Cohen alleges more than "just" the failure of these defendants to, for instance, perform head counts and cell checks. *See Goodman*, 718 F.3d at 1332–33. Rather, Cohen pleads that these defendants each facilitated or permitted flagrant violations of Jail rules after Cohen suffered two prior attacks in the day-room area and although the defendants knew of egregious overcrowding conditions and the lack of separation of violent and nonviolent detainees. *See* doc. 15 at 22–26. Despite the specific Jail rule violations, which persisted for hours, and the defendants' duties to observe the security cameras, report and enforce Jail rule violations, and inspect the cell locks, *see id.* at 22–23, the defendants purportedly did nothing to prevent or stop the other inmates from entering Cohen's cell and brutally beating him. These allegations sufficiently state violations of Cohen's Fourteenth Amendment rights.

Moreover, these rights were clearly established at the time of the incident. For a right to be "clearly established," the "'salient question' is 'whether the state of the

law' at the time of the official's conduct gave the official 'fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Dickinson*, 833 F. App'x at 273 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).[13]   In *Dickinson*, the Circuit noted two other Circuit cases that demonstrated that "failing to implement measures to address [jail] violence" in light of historical inmate-on-inmate violence, intense overcrowding, and the lack of separation of violent and nonviolent detainees constitutes "deliberate indifference" by jail officials.  *See id.* at 274 (citing *Hale*, 50 F.3d at 1581; *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1034 (11th Cir. 2001)).[14]  Confronted with similar allegations, the court concludes that Cohen plausibly pleads that the Defendant Deputies and CROs violated his clearly established Fourteenth Amendment rights by failing to prevent or intervene in the attack against him despite their knowledge of Jail rule violations before and during the assault, prior attacks against Cohen, the history of overcrowding- and understaffing conditions at the Jail,

---

[13] The Circuit "has since *Hope* identified three different ways a plaintiff can show that the state of the law gives officials fair warning of a clearly established right."  *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019).  The plaintiff can show that (1) a "materially similar case" has already been decided by the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state; (2) a "broader, clearly established principle should control the novel facts" of the situation; or (3) the case "fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary."  *Id.*

[14] *See also Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga.*, 400 F.3d 1313, 1320–21 (11th Cir. 2005) (describing the allegations in *Hale* and *Marsh*, which included the failure to separate violent and nonviolent inmates, overcrowding, understaffing, unlocked cells, and fights between inmates, as establishing "a substantial risk of serious harm").

and the Jail's failure to separate purported nonviolent detainees like Cohen from violent offenders like his assailants.

b.

The court turns next to the supervisory liability claims against Chief Deputy Hill, Major Moore, Deputy Chief Agee, Deputy Chief Thompson, Deputy Chief Rucker-Sumerlin, Captain Major, Captain Guntharp, Sergeant Boackle, Sergeant Scott, and Sergeant Posey. To hold these defendants liable, Cohen must allege that they "either participated directly in the unconstitutional conduct or that a causal connection exists between [their] actions and the alleged constitutional violation." *See Harrison*, 746 F.3d at 1298. Outside of the claims against Sergeants Scott and Posey—which are addressed, in part, earlier in this opinion—Cohen does not allege that the Supervisor Defendants personally participated in the underlying misconduct against him.[15] Thus, Cohen must establish a causal connection by alleging that "a history of widespread abuse put[] the [Supervisor Defendants] on notice of the need to correct the alleged deprivation, and [they failed] to do so," that the Supervisor Defendants' "custom or policy . . . result[ed] in deliberate indifference to constitutional rights," or that "facts support an inference that the [Supervisor

---

[15] As a result, to the extent that Cohen also pleads § 1983 claims for direct, as opposed to supervisory, liability against the Supervisor Defendants, apart from Sergeants Scott and Posey, these claims are due to be dismissed. Cohen's allegations amount only to supervisor-liability claims against these defendants. *See Harrison*, 746 F.3d at 1298.

Defendants] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *See id.*; *Dickinson*, 833 F. App'x at 272.

Under this framework, Cohen sufficiently pleads supervisory-liability claims against these defendants through the following allegations: (1) that since at least 1998 and into the 2010s, Birmingham and Bessemer Jails have suffered from intertwined overcrowding and understaffing issues that have generated widespread violence and led to insufficient access to resources, *see* doc. 15 at 14; (2) that officials with Jefferson County and its Sheriff's Office have been sued on numerous occasions over the last decade for the Jails' conditions, including overcrowding, understaffing, and brutal or fatal violence, *see id.* at 12–14; (3) that at least one lawsuit culminated in a settlement agreement obligating the Supervisor Defendants to maintain certain ratios between inmates and staff and not to overcrowd Birmingham Jail, *id.* at 17; and (4) that the Jail continues to house multiple inmates in single cells, fails to screen and separate gang members and violent offenders from nonviolent offenders, and enables inmates to "access, create, and conceal weapons and contraband," *id.* at 18.  Allegedly, the Supervisor Defendants, who each oversee aspects of the Jail's staffing, supervision, policies, and daily operations, *see* doc. 15 at 4–7, did not "schedule an appropriate number[]" of staff, "allow[ed] subordinates

to leave their posts," and failed to ensure the "proper classification of inmates, enforcement of [J]ail rules, and timely release of detainees," *see id.* at 34–35.

Like the plaintiffs in *Dickinson*, *Hale*, and *Marsh*, Cohen thus alleges that the Supervisor Defendants "knew about the history of widespread inmate-on-inmate abuse at the [J]ail," which is related to overcrowding, understaffing, and insufficient resources, and "failed to do anything about it." *See Dickinson*, 833 F. App'x at 272–73. *See also Hale*, 50 F.3d at 1583–84; *Marsh*, 268 F.3d at 1029–30, 1033–34. In other words, Cohen sufficiently pleads that "despite knowing about the history at the [J]ail," the Supervisor Defendants "acted with deliberate indifference by doing nothing to address the [J]ail's conditions," such as by employing a "proper classification system" and adequate staff. *See Dickinson*, 833 F. App'x at 272–73. Because Circuit precedent gave these defendants "fair warning" that their failures constituted deliberate indifference, Cohen plausibly pleads that they violated his clearly established Fourteenth Amendment rights. *See id.* at 275; *Hale*, 50 F.3d at 1583–84; *Marsh*, 268 F.3d at 1033–34.

## C.

Cohen also pleads state-law claims for negligence and wantonness against the Defendant Deputies and CROs, doc. 15 at 37, and for negligent and/or wanton training, assignment, and supervision against the Supervisor Defendants, *id.* at 38. In response, the defendants assert "state/absolute immunity" under Alabama law.

Doc. 19 at 2.  Again, however, the defendants fail to substantiate their claim to immunity, stating only that they "in no way concede and/or waive their right to the state/absolute immunity" under the Alabama Constitution.  Doc. 19 at 9 n.5.  And the defendants admit that their motion "only address[es] the federal claims" because this court should decline to exercise jurisdiction over the state-law claims after dismissing the federal claims.  *See* doc. 19 at 9 n.5.  These contentions are insufficient for the defendants to establish their entitlement to immunity.

Further, the defendants claim entitlement to "state/absolute immunity afforded under Article I, § 14 of the Alabama Constitution."  *Id.*  This article provides that "the State of Alabama shall never be made a defendant in any court of law or equity."  ALA. CONST. art. I, § 14.  As a result, "[s]tate officers and employees, in their official capacities and individually, . . . are absolutely immune from suit when the action is, in effect, one against the State."  *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989).  However, "a state officer or employee may not escape individual tort liability by arguing that his [or her] mere status as a state official cloaks him [or her] with the state's constitutional immunity."  *Id.* (internal quotation marks omitted).  For example, personal injury claims based on negligence committed by state officials in the line and scope of their employment "[are] not within the ambit of § 14's protection."  *Id.* (quoting *Barnes v. Dale*, 530 So. 2d 770, 783 (Ala. 1988)).

28

Thus, it is not obvious that the defendants here are entitled to absolute immunity, even if they had actually argued this claim.

Alabama law does provide, however, for "state-agent immunity," which "protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Brown v. City of Huntsville*, 608 F.3d 724, 740 (11th Cir. 2010). To claim state-agent immunity, a state official must first establish that the plaintiff's claims arise from functions that would entitle the official to immunity—*e.g.*, discretionary functions. *Id.*; *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). If an official establishes that the claims arise from his or her discretionary functions, the burden shifts to the plaintiff to show that the official acted willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. *Brown*, 608 F.3d at 741 (citing *Estate of Reynolds*, 946 So. 2d at 452); *Phillips*, 555 So. 2d at 83.

The defendants might establish that their conduct fell within their discretionary functions. But Cohen pleads that the Supervisor Defendants knew of Birmingham and Bessemer Jails' documented history of violence, overcrowding, and understaffing, as well as the specific threat against Cohen based on two previous attacks he experienced before the brutal assault. *See* doc. 15 at 30–31, 37–39. Cohen also pleads that the Defendant Deputies and CROs knew that staffing at Birmingham Jail "was grossly and dangerously inadequate" in light of its overcrowded

population, knew about the prior attacks against Cohen, and were "unable or unwilling to intervene" when fights arose. *Id.* at 30.  Thus, it is plausible to infer, at this juncture, that the defendants acted willfully, maliciously, fraudulently, in bad faith, and/or beyond their authority. *Id.* at 37–39.  Accordingly, the defendants fail to establish their entitlement to state-agent immunity.

## IV.

To close, the defendants' motion to dismiss, doc. 18, is due to be granted as to the claims against the fictitious defendants and as to the § 1983 claims for direct liability against the Supervisor Defendants, except for Sergeants Scott and Posey. In all other respects, it is due to be denied.  Because Cohen apparently has not served Captain Major and Deputy Moore, *see* doc. 19 at 1 n.1, the court will order Cohen to serve them within 14 days.[16]  Otherwise, the claims against them will be dismissed without prejudice.  A separate order effectuating this opinion follows.

---

[16] Cohen named Captain Major and Deputy Moore in his original complaint, *see* doc. 1-1 at 1, and the defendants removed his complaint to federal court on October 13, 2021, *see* doc. 1.  Therefore, Cohen has failed to timely serve these defendants.  *See* 28 U.S.C. § 1448 ("In all cases removed from any State court to any district court of the United States in which any one . . . of the defendants has not been served with process . . . such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court."); FED. R. CIV. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.").

**DONE** the 12th day of April, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE