FILED

2024 Sep-30  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Jerry L. Cohen, Jr., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:21-cv-01361-LSC |
| | ) | |
| Willie Hill et al, | ) | |
| Defendants. | ) | |

**MEMORANDUM OF OPINION**

There is pending before the Court a Motion for Summary Judgment filed by all Defendants. (Doc. 74.) The motion has been fully briefed and is ripe for review.

For the reasons provided below, the Defendants' Motion for Summary Judgment is due to be GRANTED as to the § 1983 claims and DENIED as to all state law claims. Those claims are due to be REMANDED to the Circuit Court of Jefferson County from which they were removed.

## I.  BACKGROUND

On September 11, 2019, Jerry Cohen was assaulted by a group of inmates in the Birmingham Jail where he was housed as a pretrial detainee. Based on this attack, Cohen filed this lawsuit against multiple Birmingham Jail officials.

### A. THE BIRMINGHAM JAIL

In 1998, the Civil Rights Division of the Department of Justice conducted a study of the Bessemer Jail and the Birmingham Jail, collectively the "Jefferson County Jails." (Doc. 50 at 57-75.) The study ("the 1998 Report") concluded that the Jails' operation "constitute[d] immediate, ongoing, and serious risks of harm to both staff and inmates" citing overcrowding, understaffing, and inadequate classification which all caused "rampant" inmate violence. (*Id.* at 74-75.) A decade later, a group of Birmingham Jail inmates filed a class action lawsuit alleging deplorable conditions in the Jail. (*Mason et al v. Hale et al*, Case No: 2:11-cv-03155.) The merits of the claims were not litigated, but the parties reached a settlement, which the Court approved ("the 2014 Settlement"), whereby the Birmingham Jail agreed to transfer inmates to the Bessemer Jail, hire more deputies, and hire control room operators ("CROs") to assist with monitoring inmates. (Doc. 50 at 49-52.)

In February 2019, the Bessemer Jail closed for repairs and the inmates and staff from the Bessemer Jail were reassigned to the Birmingham Jail. (Doc. 75-8 at 12:10-13:3.) The Birmingham Jail is much larger, and some describe it as housing more violent inmates. (Doc. 75-10 at 35:6-8.) Bessemer inmates were generally contained on Level 7, separate from the Birmingham inmates. (Doc. 75-9 at 19:8-21:1.)

On Level 7 of the Birmingham Jail, the inmates' cells line a circular hallway, with a control room in the center. (Doc. 72 at 2 ¶ 1.) Level 7 was composed of multiple housing "blocks" and the C-Block on Level 7 had two levels: the lower level and the mezzanine level. (Id. ¶ 2.) The control room at the center of Level 7 was staffed with a CRO and equipped with camera surveillance of the day area (the area outside of the cells) for each Block on the Level. (Doc. 75-11 at 79:12-80:5.)[1]

## B. BIRMINGHAM JAIL PROTOCOL

The Birmingham Jail is governed by General Orders. (Doc. 91-12.) According to the General Orders, jail staff is required to document activities occurring within the Jail, such as personnel entering and leaving, conducting head counts, and when inmates were "rolled in and out" of their cells. (*Id.* at Sheriff-Cohen000167.) The General Orders provide that inmates are to remain in their cells after meal service (*Id.* at Sheriff-Cohen000175, 000201); that head counts are to be conducted at each shift change, before serving meals, and when inmates are "rolled out" of their cells (*Id.* at Sheriff-Cohen000215); that deputies must enforce the Jail Rules depending on the level of violation. (*Id.* at Sheriff-Cohen000319-323.) Under the Jail Rules, inmates are prohibited from hanging clothes on the railings from 6 a.m. to 8 p.m.

---

[1] The parties dispute whether the camera surveillance could survey the inside of cells. Defendant Scott testified that even if a sheet is not hung, the camera surveillance cannot see inside other cells in the C-Block. (Doc. 75-3 at 237:18-239:14.) But Cohen argues that it is only speculation that the camera surveillance could not see inside the specific cell at issue, Cell 2. (Doc. 94 at 17.)

and blankets or sheets are never permitted outside of the cells. (Doc. 91-11 at Sheriff-Cohen000634.)

### C. THE PARTIES

Defendant James Guntharp was a Lieutenant with the Birmingham Jail. (Doc. 91-13, Sheriff-Cohen000365.)[2] On September 11, 2019, Defendant Guntharp was scheduled as the "shift commander" for the day and evening shifts (*Id*.; Doc. 91-14 at Sheriff-Cohen000487.) As the shift commander, he directly supervised the Jail's Sergeants for the day. (Doc. 75-3 at 64:11-20, 157:20-158:3; Doc. 75-10 at 80:1-80:5.)

Defendants James Posey and Terry Scott were Sergeants at the Birmingham Jail. (Doc. 75-4 at 13:13-Doc. 75-3 at 15:1.) On September 11, 2019, Defendant Scott was the desk sergeant for the day shift, scheduled to work from 6 a.m. to 2 p.m. (Doc. 91-13 at Sheriff-Cohen000365.)[3] On the same day, Defendant Posey was the block sergeant for the evening shift, scheduled to work from 2 p.m. until 10 p.m. (Doc. 91-14 at Sheriff-Cohen000487.) Ordinarily, during each shift, either the shift commander or a sergeant would walk the Jail floors at least once. (Doc. 75-10 at 78:8-80:5.)

---

[2] In September 2019 Defendant Guntharp was a Lieutenant with the Birmingham Jail. At the time of this lawsuit, Defendant Guntharp is a Captain with the Birmingham Jail. (Doc. 75-4 at 148:16-19.)

[3] Cohen alleges Defendant Scott left the Jail at 1:37pm on September 11, 2019. (Doc. 91-13 at Sheriff-Cohen000094.)

Defendants Keith Moore, Bobby Butler, Anthony Marks, and Anthony Bellipanni were Deputies at the Birmingham Jail. (Doc. 76 at p 7 ¶12-13.) On September 11, 2019, Defendants Butler and Moore were the deputies assigned to Level 7 for the day shift (6 a.m. to 2 p.m.), (*Id.*)[4], and Defendants Bellipanni and Marks were the deputies assigned to Level 7 for the evening shift (2 p.m. to 10 p.m.). (*Id.*)

Defendants Jennifer Hays and Janet Kendricks were CROs at the Birmingham Jail. (Doc. 75-10 at 5-12; Doc. 75-11 at 21:6-11.) On September 11, 2019, Defendant Hays was assigned to Level 7 for the day shift (Doc. 91-13 at Sheriff-Cohen000365) and Defendant Kendricks was assigned to Level 7 for the evening shift. (Doc. 91-14 at Sheriff-Cohen000487.)

### D. PLAINTIFF COHEN IN THE BIRMINGHAM JAIL

In June 2019, Jerry L. Cohen was arrested in Birmingham and detained at the Birmingham Jail for failing to comply with the quarterly verification provisions of the Sex Offender Registration and Notification Act (SORNA), based on a 2013 offense. (Doc. 72 at 2 ¶ 3.) A non-violent detainee, Cohen was originally housed in Level 8, where Birmingham inmates were detained for violent crimes. (Doc. 75-1 at 54:21-55:4.) In August 2019, Cohen was assaulted by an inmate in the day space

---

[4] Cohen alleges Defendant Moore left Level 7 at 12:26 pm and did not return and that Defendant Butler left Level 7 at 1:24pm and did not return. (Doc. 94 at 5.)

area of Level 8 and had to receive treatment at UAB Hospital. (Doc. 75-1 at 55:22-56:2; Doc. 91-2 Sheriff-Cohen000429.) Cohen was subsequently reassigned to housing Level 7 C-block. (Doc. 72 at 2 ¶ 4.)

On September 11, 2019, Cohen was assigned to Cell 2 on the mezzanine floor of the Level 7 C-block. (Doc. 72 at p 2 ¶ 2.) The evidence in the record establishes the following timeline for September 11, 2019.

- 9:40a.m., inmates hung sheets and clothing items from the mezzanine level railings. (*Id*. at p 2 ¶ 5.)

- 11:22a.m., two inmates walked in and out of Cell 2. (Doc. 76 at 7.)

- 11:38a.m. to 12:26p.m., Cohen moved in and out of Cell 2 and Cell 1, interacted with other inmates, and ate lunch. (*Id*. at 7-9.)

- 12:26p.m. to 12:37p.m., Cohen entered Cell 2 and multiple other inmates came and went from the cell. (Doc. 76 at 9-10.)

- 12:36 p.m., an inmate slid a hanging sheet in front of the Cell 2 door. (*Id*.)

- 12:41p.m., multiple inmates entered Cell 2 and closed the Cell 2 door. (*Id*. at 10.)

- 12:42p.m., some inmates, but not Cohen, exited Cell 2. (*Id*.)

- 12:42p.m. to 3:08p.m., inmates entered and exited cells across the C-Block, including Cell 2. Cohen did not leave Cell 2. (*Id*.)

- 1:40 p.m. to 2:13 p.m., the Level 7 evening shift staff—Deputy Marks, Deputy Bellipanni, and CRO Kendrick—arrived on the Level 7 housing level. (Doc. 72 at p 3 ¶ 7.)

- 3:08 p.m., three inmates used a blanket to move Cohen outside of Cell 2. (*Id.* at p 3 ¶ 8.)

- 3:19 p.m., Defendant Marks conducted a head count of the C-Block and found Cohen outside of his cell. (*Id.* at ¶ 9.) According to Defendant Marks there was a sheet over Cohen's head, and Cohen was disoriented and unable to speak in full sentences. (Doc. 75-8 at 43:17-45:17.)

- After completing the head count for the C-Block, Defendants Marks and Bellipanni transported Cohen to the Jail's medical provider. (Doc. 72 at p 3 ¶ 10.)

Cohen was subsequently transported to UAB Hospital where he was held for treatment for multiple weeks and diagnosed with multiple injuries. (Doc. 91-3.)

### E. PROCEDURAL HISTORY

Plaintiff Jerry Cohen filed the instant lawsuit in the Circuit Court of Jefferson County Alabama on September 3, 2021. (Doc. 1.) In his second amended complaint, Cohen brings five causes of actions against multiple defendants. (Doc. 50.) Counts One through Three allege federal claims under § 1983; Counts Four and Five allege state law claims.

In Count One, Cohen asserts a failure to protect claim in which he alleges that Sergeants Posey and Scott, Deputies Moore, Butler, Marks, and Bellipanni, and CROs Hays and Kendricks violated his Fourteenth Amendment rights by failing to adequately supervise and to follow Birmingham Jail protocol in accordance with their duties. In Count Two, Cohen asserts a failure to staff and supervise claim in which he alleges that Lieutenant Guntharp and Sergeants Posey and Scott violated his Fourteenth Amendment rights by failing to properly staff the Birmingham Jail and failing to properly train and supervise the jail staff. In Count Three, Cohen asserts a failure to intervene claim in which he alleges Deputies Moore, Butler, Marks, and Bellipanni and CROs Hays and Kendricks violated his Fourteenth Amendment rights by not following Birmingham Jail protocol on September 11, 2019, and not intervening while Cohen was being assaulted. In Count Four, Cohen asserts a negligence and wantonness claim under Alabama law in which he alleges Deputies Moore, Butler, Marks, and Bellipanni and CROs Hays and Kendricks were negligent and wanton by failing to follow the Birmingham Jail protocol and failing to enforce the Jail Rules. In Count Five, Cohen asserts a negligence and wantonness claim under Alabama law in which he alleges Lieutenant Guntharp and Sergeants Posey and Scott were negligent and wanton by failing to properly supervise and train the jail staff.

Defendants removed the case to this Court under 28 U.S.C. § 1331 federal question jurisdiction on October 13, 2021. (*Id*.) On April 12, 2022, the Court granted Defendants' Motion to Dismiss as to the fictitious defendants and Defendant Guntharp's direct liability, but otherwise denied the Motion. (Doc. 27.) On September 8, 2022, this case was reassigned to the undersigned. (Doc. 43.) On February 2, 2024, the Defendants filed this Motion for Summary Judgment (Doc. 74) and Lieutenant Guntharp, Sergeants Posey and Scott, Deputies Moore, Butler, Marks, and Bellipanni, and CROs Hays and Kendricks submitted supplemental arguments in support of the Motion for Summary Judgment. (Doc. 76, 77, 78, 79.)

## II.   STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor." *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). The Court does not weigh the evidence as fact-finder; rather, it must "determin[e] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

### III.   FEDERAL LAW CLAIMS

In this action, Cohen brings multiple claims under § 1983, which holds government officials civilly liable for violating a person's constitutional rights. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citing 42 U.S.C. § 1983). To establish a § 1983 claim, a plaintiff must demonstrate 1) a constitutional right and 2) a violation of that right. *Id*. A government official can be held to violate that right by intentional acts, *see e.g.*, *Sconiers v. Lockhart*, 946 F.3d 1256, 1267 (11th Cir. 2020) (a prison guard sexually assaulting a prisoner), or by deliberate indifference to the risk of a constitutional violation. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)) ("A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment.").

Here, Cohen alleges violations of his Fourteenth Amendment right to be protected. (Doc. 50 at 2.) While Cohen does not allege any of the Defendants were personally involved in the assault against him, Cohen does argue Defendants were deliberately indifferent to his safety in the Birmingham Jail. To make out a claim for deliberate indifference, Cohen must demonstrate 1) "that he suffered a deprivation that was, 'objectively, 'sufficiently serious,''" 2) "that [each D]efendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to [Cohen]" and 3) that [each D]efendant did not "'respond[] reasonably to the

risk.'" *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 844-45, and 839 (1994)). In sum, Cohen must show that 1) an objectively substantial risk of serious harm to Cohen existed in the Birmingham Jail, 2) each Defendant was subjectively aware of the risk of harm, 3) each Defendant responded unreasonably, and 4) each Defendant's unreasonable response caused Cohen's subsequent injuries.

In moving for summary judgment on the § 1983 claims, Defendants' sole argument is that they are protected from liability by qualified immunity. (Doc. 76 at 15; Doc. 77 at 13; Doc.  78 at 13; Doc. 79 at 13.) Qualified immunity shields government officials from being sued for damages in their personal capacity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In order to be entitled to qualified immunity, an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019) (citing *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2012)). After the official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show 1) the defendant violated a constitutional right and 2) the right was clearly established at the time of the violation. *See Hunter*, 941 F.3d at 1278 (citing *Morton*, 707 F.3d at 1281).

Here, the record contains sufficient evidence that all Defendants were acting within their discretionary authority. A government official acts within his

discretionary authority if his actions "are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). All the allegedly violative conduct—staffing, supervising, training, monitoring, enforcing—fell within the respective Defendants' job responsibilities at the Birmingham Jail. All Defendants have satisfied their burden of proving discretionary authority and the burden shifts to Cohen to show the Defendants 1) violated a constitutional right that was 2) clearly established. This Court's analysis proceeds by assessing whether Cohen has satisfied his burden to overcome qualified immunity as to each group of Defendants.

## A. DEPUTIES AND CROS

Cohen argues that Defendant Deputies Moore, Butler, Marks, and Bellipanni and CROs Hays and Kendricks violated his Fourteenth Amendment right to be protected by failing to follow Birmingham Jail protocol.[5] To overcome qualified

---

[5] Cohen points to multiple violations of Birmingham Jail protocol on September 11, 2019.
**Removing the Sheet** –Defendants Bellipanni and Marks did not remove the sheet during their evening shift on Level 7. (*Id*.) Presumably, Defendant Hays did not alert deputies to the sheet or order the inmates to remove the sheet over the intercom during her morning shift on Level 7 (Doc. 91-13 at Sheriff-Cohen000365) and Defendant Kendricks did not alert deputies to the sheet or order inmates to remove the sheet over the intercom during her evening shift. (Doc. 91-14 at Sheriff-Cohen000487.)
**Walking out of cells** – On September 11, 2019, inmates in the Level 7 C-Block walked in and out of each other's cells, which violated the Jail Rules, and evidence suggests Defendants Butler, Moore, Bellipanni, Marks, Hays, and Kendricks did not stop this violation. (Doc. 75-12 at 12:41-15:08.)
**Headcount** – Defendants Butler and Moore conducted a headcount in the Level 7 C-Block at 8:10am (Doc. 91-13 at Sheriff-Cohen000080) and possibly while serving lunch at 11:58am. However, there is no evidence of Defendants Butler and Moore conducting a headcount at the end of their shift, as the General Orders require. (Doc. 91-13 at Sheriff-Cohen000082; Doc. 75-12 13:24-14:00.) The record shows Defendants Bellipanni and Marks conducted a headcount in Level 7 C-Block around 2:56pm, but there is not evidence they conducted a headcount exactly when their shift started at 2pm. (Doc. 91-13 at Sheriff-Cohen000082.)
**Cell door lock** – Evidence suggests the electronic system of tracking cell door lock functions on Levels 7, 8, and 9 was not operating at 1:32pm on September 11, 2019 (Doc. 91-13 at Sheriff-Cohen000094), but there is no evidence of deputies manually checking the Level 7 C-Block cell door locks at the time.

immunity, Cohen must establish that this conduct constituted a clearly established constitutional violation.

### 1. Constitutional Violation

Cohen failed to present sufficient evidence that Defendant Deputies' and CROs' failure to follow protocol constituted deliberate indifference in violation of the Fourteenth Amendment.

Deliberate indifference claims require showing, among other things, that the official had subjective knowledge of the risk of harm to the plaintiff. *See Wade*, 106 F.4th at 1262. In *Goodman*, the Circuit found jail officers' violation of protocol— failing to perform a head count or cell checks, deactivating emergency call buttons, taking multiple long meal breaks—did not constitute deliberate indifference because there was no "evidence of prison officials' subjective awareness of a substantial risk of serious harm to the inmate." *Goodman*, 718 F.3d at 1333-34.

---

**Respond to suspicious behavior** – Looking at still frame photos of Level 7 C-Block video surveillance from September 11, 2019 from 12:40pm to 3:09pm, Defendant Posey testified to multiple elements in the block raising "suspicion." (Doc. 75-4 at 198:8-208:18.) However, there is no evidence of Defendants Butler, Moore, Bellipanni, Marks, Hays, or Kendricks responding to the suspicion until Defendants Bellipanni and Marks conducted the headcount around 2:56pm. (Doc. 91-13 at Sheriff-Cohen000082.)
**Leaving their station** – The record suggests Defendant Hays left the control room three times during her day shift, for less than ten minutes each time. (Doc. 91-13 at Sheriff-Cohen000089-90, Sheriff-Cohen000082.) It is unclear from the record whether the control room was ever left completely unattended during the September 11, 2019, day shift. (Doc. 93 ¶¶ 47-53.)
**Inmates not locked down** – Birmingham Jail protocol required inmates to be locked down in their cells after lunchtime meal, but the inmates in the Level 7 C-Block were not put in lock down after lunch on September 11, 2019. (Doc. 75-12 at 11:58-13:00.)

Here, Cohen points to evidence that Defendant Deputies and CROs knew their responsibility was to support the safety and security of the Birmingham Jail. (Doc. 75-11 at 26:16-19.) Cohen further shows evidence that Defendant Deputies and CROs knew the Birmingham Jail protocol—the General Orders—and the specific rules it established. (Doc. 75-7 at 32:17-19; Doc. 75-6 at 30:18-22; Doc. 75-8 at 42:1-4; Doc. 75-9 at 40:8-9.) However, like in *Goodman*, the record is void of evidence that these Defendants knew that failing to follow the protocol could result in harm to an inmate. Cohen does not provide evidence of previous instances of inmate attacks occurring behind hanging sheets or to evidence that he specifically was a target for violence. "[T]he fact that the [Defendant Deputies and CROs] deviated from policy or were unreasonable in their actions—even grossly so—does not relieve [Cohen] of the burden of showing that the [Defendants] were subjectively aware of the risk; in other words, he cannot say, 'Well, they should have known.'" *Goodman*, 718 F.3d at 1334. The record does not contain sufficient evidence that Defendant Deputies' and CROs' conduct constituted deliberate indifference.

## 2.  CLEARLY ESTABLISHED

However, even if the record does contain sufficient evidence of deliberate indifference, Defendant Deputies and CROs are still owed qualified immunity because Cohen does not provide evidence their conduct violated a *clearly established* right. For purposes of qualified immunity, "[a] clearly established right

is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). For this analysis, a constitutional right was clearly established when both the "abstract right" was established and the fact that specific conduct "infringes the right" was established. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) ("A reasonable official's awareness of the existence of an abstract right, such as a right to be free of excessive force, does not equate to knowledge that his conduct infringes the right."). In other words, the "clearly established" analysis hinges on whether there was "plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law." *Marsh v. Butler*, 268 F.3d 1014, 1031 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007). It is not necessary for the "very action in question" to have been previously "held unlawful," but the "unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

There are generally three methods of showing that a right and a specific infringement of that right were clearly established: 1) a "materially similar case has already been decided,"[6] 2) there is "a broader, clearly established principle that

---

[6] Case law of the United State Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court is applicable. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

should control the novel facts of the situation," or 3) when the "words of the…federal constitutional provision [are]…specific enough to establish clearly the law applicable to particular conduct" or when the "conduct is [] so egregious as to violate" the Constitution "on its face." *Vinyard v. Wilson*, 311 F.3d 1340, 1350-51 (11th Cir. 2002) *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Here, under the Fourteenth Amendment, prison officials have a duty to protect pretrial detainees through "reasonable measures to guarantee [detainees'] safety." *Farmer*, 511 at 832 (discussing convicted inmates' rights under the Eighth Amendment).[7] Cohen's constitutional right to be protected was clearly established in 2019. However, it was not clearly established in 2019 that failing to follow the relevant jail policies could infringe on Cohen's Fourteenth Amendment rights.

First, failing to follow jail policies did not "obviously" violate the Constitution. The Fourteenth Amendment provides, in relevant part, "nor shall any State deprive any person of life, liberty, or property without due process of law." U.S. CONST. Amend. XIV § 1. The language of this Amendment is not "specific enough" to clarify whether its rights are violated by a prison official failing to follow protocol. *See Vinyard*, *supra*. Additionally, the Defendants' conduct is not "so

---

[7] While convicted prisoners have rights under the Cruel and Unusual Punishment Clause of the Eighth Amendment, detainees have rights under the Due Process Clause of the Fourteenth Amendment. But the analysis is the same under both provisions. *Hale*, 50 F.3d at 1582 n. 4.

egregious" as to obviously violate Cohen's constitutional rights. *See id*. *See e.g.*, *Scott v. Dunn*, 2023 WL 2497888 at *5-6 (M.D. Ala. Mar. 14, 2023) (finding deputies "obviously" violated an inmate's constitutional rights when they responded to the inmate informing them of a specific rape threat by laughing, threatening to stand by while he was being raped, transferring him to the same dormitory as the source of the threat, and returning him to the same dormitory after being raped once).

Next, Cohen does not direct the Court to, and the Court is not aware of, a "materially similar" case. Instead, there are cases finding prison officers do *not* violate constitutional rights when they fail to follow specific prison procedure. In *Goodman*, there was evidence that on the night an inmate was severely beaten by his cellmate, jail guards did not perform required headcounts or cell checks, deactivated an inmate's emergency call button without investigating, and took two meal breaks away from their station. *Goodman*, 718 F.3d at 1332. Despite finding this conduct suggested a "dereliction of duty that facilitated the violence" on the inmate, the Eleventh Circuit affirmed summary judgment for the jail guards finding their conduct did not constitute deliberate indifference. *Id*. at 1334.

Finally, broad principles in the law do not clarify the issue. In *Farmer*, the seminal case defining deliberate indifference claims, the Supreme Court held that "prison officials have a duty…to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. But the Court went on to clarify that not

"every injury suffered by one prisoner at the hands of another [] translates into constitutional liability for prison officials." *Farmer*, 511 U.S. at 834. *See also Goodman*, 718 F.3d at 1334 (condemning jail guards' "dereliction" of their duties but finding controlling precedent required affirming summary judgment for the jail guards).

In addition to there being insufficient evidence that their conduct constituted deliberate indifference, Defendant Deputies and CROs were not given "fair warning" that failure to follow Birmingham Jail protocol would violate an inmate's Fourteenth Amendment rights. They are owed qualified immunity. The Motion for Summary Judgment as to the § 1983 claims pending against Defendant Deputies and CROs is due to be GRANTED.

## B. SERGEANTS

Cohen alleges Defendant Sergeants Posey and Scott were deliberately indifferent, violating his Fourteenth Amendment rights, by failing to follow Birmingham Jail protocol[8] and failing to properly staff, train, and supervise the deputies and CROs. To overcome qualified immunity, Cohen must establish that this conduct violated a clearly established constitutional right. Cohen does not establish that Defendant Sergeants' failing to follow protocol, staffing, training, or

---

[8] For example, the record shows Defendant Scott failed to remove the sheet from the mezzanine rail when he passed the Level 7 C-Block to respond to an inmate incident in the Level 7 D-Block. (Doc. 91-13 at Sheriff-Cohen000082.) Defendants Butler and Moore did not remove the sheet during their day shift on Level 7, even when they were in the C-Block conducting a headcount at 11:58am. (Doc. 76 at p 7 ¶12-13.)

supervising constituted deliberate indifference. The Defendant Sergeants are owed qualified immunity.

### 1. CONSTITUTIONAL VIOLATION

Cohen failed to present sufficient evidence for a deliberate indifference claim because there is insufficient evidence of an objective substantial risk of serious harm to Cohen, of Defendant Sergeants' subjective knowledge of the risk, of Defendant Sergeants' unreasonable response, or of Defendant Sergeants causing any harm to Cohen.

### a) SUBSTANTIAL RISK OF SERIOUS HARM

"In the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." *Purcell ex rel. Estate of Morgan v. Toombs County, Ga.*, 400 F.3d 1313, 1323 (11th Cir. 2005). But a substantial risk of serious harm exists when there are "conditions that [are] extreme and pose[] an unreasonable risk of serious injury to [inmates'] health or safety." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016). This element is satisfied by evidence of a specific inmate being threatened by a specific circumstance. *See e.g., Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016) (finding a substantial risk of serious harm to an inmate housed with a convicted murderer). This element is also satisfied by evidence of specific prison features that create a generalized risk of harm to all inmates. *See Marsh*, 268 F.3d at 1029, 1034 (finding allegations of no segregation, overcrowding,

understaffing, no head counts, dysfunctional cell door locks, homemade weapons readily available to inmates, no lock down of inmates during the day, no visual inspection of cells, failure to follow written policies, no screening inmates for mental or medical conditions, and no discipline or segregation when inmates misbehaved sufficiently alleged an objective substantial risk of serious harm). *But see Purcell*, 400 F.3d at1321 (reversing denial of jail administrator's motion for summary judgment because evidence of inmates being allowed to keep money and gamble, of the physical layout of the Jail hindering guards from preventing attacks, and of a history of inmate violence in the jail (based on another inmate's deposition testimony) was insufficient to establish a substantial risk of harm to an inmate).

Cohen does not argue there were specific circumstances that posed a specific threat to him in the Birmingham Jail, like the known violent cellmate in *Bowen*. Rather, Cohen argues there is sufficient evidence in the record, like in *Marsh*, to show that specific features of the Birmingham Jail created an objective substantial risk of serious harm to him and all other inmates. First, there is evidence the Birmingham Jail was understaffed. (Doc. 75-10 at 59:6-10) ("Yeah, that's some understaffed. We had shortages, you know, a lot of times. Law enforcement staff is never staffed enough. You can't ever get enough staffing."). The 1998 Report described the Birmingham Jail as "dangerously understaffed" with a staff/inmate ration of 1:11 compared to the national average of 1:4 or 1:5. (Doc. 50 at 62.)

Similarly, the 2014 settlement acknowledged "critical staff shortages at the [Birmingham] Jail." (*Id.* at 51.) While describing the process of changing the shift schedule, Defendant Scott admitted "yet again, we were short staffed." (Doc. 75-3 at 227:10-14.) Defendant Scott testified that while he was working for the Birmingham Jail (for over two years) it was "50/50" whether he was the only scheduled sergeant for a shift (there were supposed to be three sergeants per shift). (Doc. 75-3 at 126:1-11.) On September 11, 2019, the Birmingham Jail was about sixty percent staffed; the Birmingham Jail schedule had slots for eighteen deputies on housing levels and three sergeants per shift (Doc. 91-13 at Sheriff-Cohen000365 and Doc. 91-13 at Sheriff-Cohen000487) but there were only twelve deputies on the housing levels and one sergeant on September 11, 2019. (Doc. 75-3 at 153:1-154:16.)

Next, there is some evidence the Birmingham Jail was overcrowded. The 1998 Report described the Bessemer Jail and the Birmingham Jail as "dangerously overcrowded," describing the Jails as operating at well over maximum designed capacity. (Doc. 50 at 61.) The 1998 Report additionally described the overcrowding as "compromis[ing] any attempt to fully implement a classification system," which caused inmate-on-inmate violence. (*Id.* at 67.) Further, the Order approving the 2014 settlement acknowledged that the Birmingham Jail was continuing to operate overcapacity even after reopening the Bessemer Jail. (*Id.* at 50.) But while "the

settlement agreement [did] not eliminate overcrowding completely, it substantially reduce[d] it." (*Id.* at 51.)

Additionally, there is also testimony that inmate-on-inmate assaults were common. The 1998 Report described "clear evidence of a pattern of harm to inmates that is alarming in its scope, seriousness and frequency" citing multiple incident reports from October 1997 to February 1998. (Doc. 50 at 70.) The Report connected the inmate-on-inmate violence to inadequate supervision and overcrowding. Defendant Deputy Bellipanni testified that the Birmingham Jail "had fights all the time. We had fights and assaults…it could very well be a very dangerous place." (Doc. 75-9 at 120:1-4.) Bellipanni said the assault on Cohen "did not stand out in [his] mind that was something that was particularly grievous, for instance, or significant. It was to [him] just another assault." (*Id.* at 120:9-13.) Additionally, between his incarceration in June 2019 and the September 11th assault, Cohen was assaulted by another inmate. (Doc. 76 at 5 ¶ 5.)

Further, there is some evidence that Jail Rules were not enforced. For example, it was against Jail Rules for things to hang on the rails. (Doc. 75-3 at 229:19-20.) But Defendant Sergeant Scott testified that inmates "frequently" hung things on the rails. (*Id.* at 231:14-4.) A sheet was hanging over the mezzanine rail in the Level 7 C-block while Cohen was assaulted on September 11, 2019. (*Id.* at 230:9-15.) Additionally, according to Jail Rules the cell doors were supposed to be locked

at specific times. (Doc. 75-8 at 41:13-23.) The cell doors were designed to automatically lock when they were shut. (Doc. 75-4 at 157:5-7.) But sometimes the inmates would block the lock mechanism to prevent it from automatically locking and it would still register as locked on the computer. (*Id*. at 157:8-16; Doc. 75-3 at 8-18.)

Cohen argues the record supports a finding that the Birmingham Jail, like the facilities in *Marsh* and *Hale*, was dangerous to all inmates, including himself. There is evidence of specific features of the Birmingham Jail that may have posed a risk of harm to inmates. However, when synthesized, the evidence of violence is slim: a twenty-year-old report (the 1998 Report), a settlement agreement that was complied with (the 2014 Settlement), one deposition (Defendant Deputy Bellipanni), and the fact that Cohen was attacked one other time in the previous four months.

Admittedly, in *Marsh*, the Circuit held that evidence of previous violence is not a prerequisite for finding a substantial risk of serious harm to inmates. *Marsh*, 268 F.3d at 1034. However, in *Marsh*, the Circuit was faced with allegations of a multitude of failing conditions in the Jail: no segregation, overcrowding, routine understaffing, no head counts, dysfunctional doors, readily available weapons, no lock down of prisoners at any time, no visual inspection of cells, no assigned guard, no written policies governing the Jail, no screening for mental health, and no disciplinary action against misbehaving inmates. *Id*. at 1029.

This case is different. Other than the minimal evidence of violence, there is evidence the Birmingham Jail was overcrowded in 1998 and 2014 but no evidence it was overcrowded in 2019, evidence the Birmingham Jail was understaffed in 2019, evidence the Jail Rules sometimes went unfollowed, and evidence the cell door locks were not always functional. A reasonable jury could not find an objectively substantial risk of serious harm to all inmates, including Cohen, in the Birmingham Jail based on that evidence.

b)  SUBJECTIVE KNOWLEDGE

But even if there is sufficient evidence of an objectively substantial risk of serious harm to Cohen in the Birmingham Jail, Cohen failed to present sufficient evidence of Defendant Sergeants' subjective knowledge of that risk. Subjective knowledge requires showing the official is "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and…also draws the inference.'" *Bowen*, 826 F.3d at 1320-21 (quoting *Farmer*, 511 U.S. at 837). Circumstantial evidence can also collectively establish subjective knowledge of harm. *See Lane*, 835 F.3d at 1309-10 (finding a permissible inference that the prison officials knew of the risk of harm in a specific prison wing when the defendants' job titles implied "they were in a position to be subjectively aware of security-related issues" and there was evidence the officials consistently threatened to send inmates to the specific wing of the prison).

Cohen argues that, like the documentation in *Marsh*, the 1998 Report and the 2014 Settlement put Defendant Sergeants on notice of the dangerous conditions in the Birmingham Jail. However, unlike in *Marsh*, where the documentation went directly to the Sheriff in her official capacity, the record here is void of any evidence that Defendant Sergeants ever encountered the 1998 Report or the 2014 Settlement. Additionally, there is no evidence that these Defendants would have encountered either the Report or the Settlement in the course of their duties. Based on this, the 1998 Report and the 2014 Settlement cannot be the basis for the Defendants' subjective knowledge of the risk of harm to Cohen in the Birmingham Jail.

This case is also unlike *Lane* where the court found the prison officials' titles, which implied knowledge of security issues in the prison, combined with other evidence of subjective knowledge sufficiently alleged that defendants knew of the risk of harm. Here, the title "Sergeant" implies some level of knowledge about events at the Birmingham Jail. But that evidence *alone* is insufficient to show they subjectively knew of the 1998 Report or the 2014 Settlement, much less of a substantial risk of serious harm to Cohen.

The record does not contain evidence such that a reasonable jury could find Defendant Sergeants subjectively knew of the substantial risk of serious harm to Cohen in the Birmingham Jail.

c) Unreasonable Response

Even if there was sufficient evidence that Defendant Sergeants subjectively knew of the risk of harm to Cohen, they "'cannot be found liable'...if [they] 'reasonably responded to the risk.'" *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844-45). A prison official responds unreasonably to a known risk when they "knowingly or recklessly declined to take action that would have improved the conditions." *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993) (finding the prison warden acted deliberately indifferent because he did not take steps within his authority to improve prison safety such as "ensur[ing] that his direct subordinates followed the policies he established"). *See also Hale*, 50 F.3d at 1582-84 (denying summary judgment for the Sheriff because the plaintiff "offered evidence of several reasonable measures to reduce the risk of violence *that were available to*" the Sheriff—like segregating inmates, adequately training jailers, and adequately supervising inmates—that the prison official did not take) (emphasis added).

Cohen argues it was unreasonable for Defendant Sergeants to 1) not follow protocol, 2) not properly staff the Birmingham Jail, 3) not properly train the jail staff, and 4) not properly supervise the jail staff.

(1) Failure to Follow Protocol

The only evidence in the record of Defendant Sergeants personally failing to follow protocol is one instance of Defendant Scott not enforcing a Jail Rule.

Evidence suggests Defendant Scott, and other deputies, walked by the Level 7 C-Block on September 11, 2019, while a sheet was hanging from the mezzanine railing. (Doc. 91-13 at Sheriff-Cohen000082.) Defendant Scott did not stop and order inmates to remove the sheet. However, he passed the C-Block while responding to a "rover call," which is a call for all available jail staff due to an inmate incident. (*Id*.)

This singular incident provides no evidence that Defendant Posey unreasonably failed to follow protocol. Additionally, because Defendant Scott was responding to what was likely an emergency on September 11, 2019, no reasonable jury could find it unreasonable of Defendant Scott to not stop and remove the sheet.

### (2) FAILURE TO STAFF

The record contains insufficient evidence that Defendant Sergeants *could* properly staff the Jail. Defendant Sergeants were responsible for scheduling the deputies and CROs (Doc. 75-3 at 124:3-125:6, 136:4-11, 153:11-19), but there is no evidence that Defendant Sergeants had the authority to hire more deputies or CROs.

Cohen argues that Defendant Sergeants had authority to recruit patrol deputies to fill in at the Jail. This is entirely based on Deputy Bellipanni's testimony:

> "I also heard of an instance at one time that the – they were so short staffed that they would call deputies in off patrol and the patrol deputies would come in. And because all the deputies had started out in the jail before they go on patrol, everyone had experience and the ability to work the jail and the jail was the primary mission of the sheriff's department."

(Doc. 75-9 at 165:21-166:5.) This statement, an out-of-court statement offered for its truth, is hearsay. *See* Fed. R. Evid. 801(c). "[A] district court may consider a hearsay statement in passing on a motion for summary judgment [only] if the statement could be reduced to admissible evidence at trial." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (internal quotation omitted). No hearsay exception would make Bellipanni's statement admissible at trial. Also, no source of the incident is provided, so a witness could not be called to provide admissible testimony. This Court cannot consider this statement—"I also heard of an instance…"—at summary judgment. In short, there is no evidentiary basis for Cohen's contention that Defendant Sergeants could have staffed the Birmingham Jail with patrol deputies or increased the staff at the Jail.

### (3) FAILURE TO TRAIN

Cohen argues Defendant Sergeants unreasonably trained the deputies and CROs. But there is no evidence that Defendant Sergeants were responsible for training the deputies or CROs. Based on this, a reasonable jury could not find Defendant Sergeants unreasonably trained the deputies and CROs.

### (4) FAILURE TO SUPERVISE

Cohen argues Defendant Sergeants' supervision of deputies and CROs was unreasonable. Defendant Posey admitted that he did not interact with deputies or CROs beyond telling them where to go at the beginning of their shift. (Doc. 75-4 at

14:14-18.) As previously discussed, evidence suggests Defendant Scott did not always ensure the deputies and CROs were enforcing the Jail Rules. (Doc. 91-13 at Sheriff-Cohen000082.) However, there is also evidence that Defendant Sergeants were taking measures to supervise the deputies and CROs. Defendant Scott testified that he would walk the housing floors and touch base with the jail staff during every shift. (Doc. 75-3 at 125:3-6.) There is testimony that the custom was for the shift commander or a sergeant to walk the housing levels at least once every shift. (Doc. 75-10 at 78:8-80:5.) Further, Defendant Scott described occasions of personally walking to the housing level to correct inmates violating Jail Rules. (Doc. 75-12 at 231:18-21.) Without more evidence in the record, Cohen's conclusory statements that Defendant Sergeants unreasonably supervised the deputies and CROs cannot survive summary judgment.

### d) CAUSATION

Additionally, Cohen cannot satisfy the requirements of causation. There are two components to causation. *Hale*, 50 F.3d at 1584. First, there must be a link between the Defendant's alleged deliberate indifference and the substantial risk of harm to Cohen. *Id.* at 1584-85 (finding sufficient evidence for a reasonable jury to determine the Sheriff's conduct caused the excessive risk of violence in the jail). Determining whether an individual's failures contributed to a substantial risk of harm to an inmate "necessarily entails a very individualized approach, taking into

account the duties, discretion and means of each defendant." *Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982) (holding that a plaintiff "must demonstrate that a particular defendant had the capability (authority and means) to provide adequate security and did not do so."). Second, there must be a link between the substantial risk of harm to the plaintiff and the plaintiff's injury. *Id. But see LaMarca*, 995 F.2d at 1538-39 ("[T]he finding that a prison condition offends the Eighth Amendment presupposes the distinct likelihood that the harm threatened will result.").

Here, there is no evidence that Defendant Sergeants' conduct contributed to the allegedly dangerous conditions or specifically to Cohen's injuries. As discussed above, there is no evidence that Defendant Sergeants had authority over staffing levels at the Birmingham Jail. Based on this, there is no evidence these Defendants *caused* any of the alleged understaffing at the Birmingham Jail. Similarly, there is no evidence that Defendant Sergeants had authority over training the deputies or CROs and so there is insufficient evidence that Defendant Sergeants' training *caused* any of the allegedly deficient training. Finally, there is insufficient evidence that Defendant Sergeants improperly supervised the deputies and CROs. Based on this, there is insufficient evidence that Defendant Sergeants' supervision *caused* any of the dangerous conditions in the Birmingham Jail or the specific injury to Cohen.

Cohen failed to provide sufficient evidence for any of the elements of a deliberate indifference claim against Defendant Sergeants. Thus, Defendant Sergeants are owed qualified immunity and due Summary Judgment as to the § 1983 claims alleged against them.

### C. LIEUTENANT GUNTHARP

Cohen alleges Defendant Guntharp was deliberately indifferent, violating his Fourteenth Amendment rights by failing to properly staff, train, and supervise the jail staff. The only remaining claims against Defendant Guntharp are in his *supervisory* capacity. (Doc. 27.) Defendant Guntharp is owed qualified immunity.

#### 1. CONSTITUTIONAL VIOLATION

Cohen failed to present sufficient evidence for a deliberate indifference claim against Defendant Guntharp because there is insufficient evidence to hold him liable as a supervisor under § 1983. Even if Defendant Guntharp could be liable as a supervisor, there is insufficient evidence of a relevant objective substantial risk of serious harm to Cohen in the Birmingham Jail, of Defendant Guntharp's subjective knowledge of the risk, of Defendant Guntharp's unreasonable response, or of Defendant Guntharp causing any harm to Cohen.

##### a) SUPERVISORY LIABILITY

There is an "extremely rigorous" standard to hold supervisors liable in § 1983 claims. *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (citation

omitted). "[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360 *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). To establish the requisite causal connection, the plaintiff must either allege (1) "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation"; (2) that the supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights"; or (3) circumstantial evidence "that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal citation omitted).

In opposing summary judgment, Cohen does not articulate evidence of Defendant Guntharp directing subordinates to act unlawfully or of a "custom or policy" of deliberate indifference. Rather, Cohen argues the 1998 Report and the 2014 Settlement established "known, widespread and obvious risks of harm to inmates in the Birmingham Jail." (Doc. 94 at 24.) But for a widespread pattern of abuse to invoke supervisor liability, it must be "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Keith v. Dekalb County*, 749

F.3d 1034, 1048–49 (11th Cir. 2014) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).

The 1998 Report and 2014 Settlement alone do not establish a "history of widespread abuse." First, the 1998 Report was based on analysis of the Jail *over twenty years before* the incident at issue in this case. Additionally, the 2014 class settlement acknowledged dangerous conditions in the Jail, but also established remedies for those conditions. One remedy was to re-open the Bessemer Jail, which was admittedly undone in 2019 for the repairs to the facility. But the other remedy was to institute CROs, which the record before this Court establishes are still being staffed at the Jail. (Doc. 91-13 at Sheriff-Cohen000365.)

But even if the 1998 Report and 2014 Settlement did establish "obvious, flagrant, rampant" abuse, the record does not contain any evidence that Defendant Guntharp was exposed to those documents. Further, Cohen does not present evidence of whether Defendant Guntharp was working at the Birmingham Jail in 1998 or in 2014. This is insufficient evidence to hold Defendant Guntharp liable as a supervisor.

b) Substantial Risk of Serious Harm

Even if there is sufficient evidence to hold Defendant Guntharp liable as a supervisor, there is insufficient evidence that an objective substantial risk of serious harm to Cohen existed at the Birmingham Jail.

As discussed above, Cohen's only evidence of violence in the Birmingham Jail is the 1998 Report, the 2014 Settlement, the deputy's deposition referred to earlier, and the fact that Cohen was assaulted once before in the span of four months. Cohen also presents evidence of understaffing and Jail Rule violations, but that is insufficient for a reasonable jury to find a substantial risk of serious harm to inmates in the Birmingham Jail.

c) SUBJECTIVE KNOWLEDGE

Even if there was a substantial risk of serious harm to Cohen in the Birmingham Jail, there is insufficient evidence that Defendant Guntharp knew of the risk of harm. As with the Defendant Sergeants, Cohen argues that the 1998 Report and the 2014 Settlement prove Defendant Guntharp knew of the risks of harm in the Birmingham Jail. But as with the Defendant Sergeants, the record here is void of any evidence that Defendant Guntharp ever encountered or would have encountered the 1998 Report or the 2014 Settlement. Like the jail officials in *Lane,* Defendant Guntharp's title, "Lieutenant," implies a heightened level of knowledge of the occurrences in the Birmingham Jail. However, unlike in *Lane*, where there was other circumstantial evidence of the jail officials' subjective knowledge, the record here does not contain other evidence suggesting Defendant Guntharp knew of the alleged dangerous conditions in the Birmingham Jail. There is insufficient evidence that

Defendant Guntharp had subjective knowledge of substantial risk of serious harm to inmates in the Birmingham Jail.

### d) UNREASONABLE RESPONSE

Additionally, there is insufficient evidence that Defendant Guntharp's conduct was unreasonable. Cohen alleges Defendant Guntharp's 1) staffing, 2) training, and 3) supervising of the jail staff was unreasonable.

### (1) FAILURE TO STAFF

The record does not contain any evidence that Defendant Guntharp *could* properly staff the Jail. Defendant Guntharp, a Lieutenant at the Birmingham Jail in 2019, undoubtedly had some authority at the Jail. However, the record does not contain any evidence that Defendant Guntharp had the authority to hire more staff. Further, as discussed above, Cohen's contention that Defendant Guntharp had authority to recruit patrol deputies to staff the Jail is not founded on admissible evidence and cannot be considered at summary judgment.

### (2) FAILURE TO TRAIN

"[A] plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate [] constitutional rights,' and that armed with that knowledge the supervisor chose to

retain that training program." *Keith*, 749 F.3d at 1052 (quoting *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011)).

There is evidence that training jail staff was within Defendant Guntharp's authority. (Doc. 75-4 at 151:11-153:2). However, Cohen merely concludes, without pointing to evidence, that the training was deficient.[9] Thus, there is no evidence that Defendant Guntharp was on "constructive notice" of deficiencies in the training sufficient to invoke failure to train liability under *Keith*.

### (3) FAILURE TO SUPERVISE

Cohen argues that Defendant Guntharp unreasonably supervised the deputies and CROs. This is seemingly based entirely on one deputy's testimony that he rarely, if ever, saw Defendant Guntharp on the housing level. (Doc. 75-8 at 78:21-79:18.) A reasonable jury could not find unreasonable supervision based only on that evidence.

### e) CAUSATION

There is also insufficient evidence that Defendant Guntharp's conduct—hiring, training, or supervising—caused any of the allegedly dangerous conditions in the Birmingham Jail or more particularly the injury to Cohen.

---

[9] Deputy Bellipanni testified that he did not receive any training from Defendant Guntharp. (Doc. 75-9 at 160:19-161:6.) But this does not prove a deficiency in the training because directly training deputies was not Defendant Guntharp's responsibility. (Doc. 75-4 at 151:11-153:2)

Cohen failed to provide sufficient evidence of a widespread abuse of harm in the Birmingham Jail sufficient to hold Defendant Guntharp liable as a supervisor. Additionally, Cohen failed to provide sufficient evidence of any elements of a deliberate indifference claim. Defendant Guntharp is owed qualified immunity as to the § 1983 claims made against him and thus Summary Judgment is due to be entered as to these claims.

## II.    STATE LAW CLAIMS

In addition to the above § 1983 federal claims, Cohen also brings state claims against all Defendants. The court previously exercised supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a). While district courts have discretion to continue exercising supplemental jurisdiction after the federal claims have been dismissed, district courts are "encouraged…to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 866 (11th Cir. 2022).

This Court hereby finds the state law claims against Defendants are due to be REMANDED to the Circuit Court of Jefferson County.

## III.    CONCLUSION

In summary, for the reasons discussed above, Defendants' Motion for Summary Judgment on the § 1983 claims—Counts One, Two, and Three—is due to

be GRANTED. The remaining claims—Counts Four and Five—are due to be REMANDED to state court for further proceedings.

The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on September 30, 2024.

L. Scott Coogler
United States District Judge

220595